**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DERRICK MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-cv-3315 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Derek Mitchell works for the City of Chicago's Department of Revenue as a tax auditor. Plaintiff has sued the city, alleging that between 2006 and 2009 he was harassed, suspended, and denied merit-based raises because of his race (African American), and subjected to retaliation for filing discrimination charges with the Illinois Department of Human Resources and the Equal Employment Opportunity Commission. Before the Court is Defendant's motion for summary judgment [114]. For the reasons stated below, Defendant's motion is granted.

**I.      Background**

The Department of Revenue manages the City of Chicago's financial resources. The Tax Division is responsible for all tax operations, including the administration and processing of taxes for the city. From 2006 to 2009, the Tax Division was divided into the following sections: Tax Policy, Compliance Analysis, Tax Administration, Customer Service, and Field Auditing. The Tax Division designates auditors as Auditor I, II, III, or IV based on his or her experience

and knowledge of tax law. Auditor I is an entry level position, whereas an Auditor IV may have supervisory duties over other auditors.

Auditors receive written performance evaluations twice a year. The evaluations are compiled by an auditor's direct supervisor and reviewed by the manager of the employee's section. Evaluations are intended to provide a detailed analysis of the auditor's performance based on his or her productivity, work quality, and teamwork and leadership skills. In addition, auditors often receive reviews at the completion of an audit.

Near the beginning of each year, auditors meet with their supervisors to learn the number of assessments that they are expected to complete during the year. The auditor also sets targets for the number of assessments that he or she plans to complete each month, taking into account anticipated vacations and holidays. An auditor's productivity rating depends (in part) on meeting those goals and the average number of hours spent on each assignment.

On the anniversary of their hire or promotion date, auditors are evaluated for a merit pay increase. Merit pay evaluations are separate from performance evaluations, so a poor performance evaluation does not guarantee that an auditor will not receive a merit pay increase, although the two generally go together. In certain cases, an employee may have an opportunity to address issues raised in his or her performance evaluation prior to a merit pay evaluation. Denials of merit pay increases are reviewed in light of the auditor's subsequent performance.

Plaintiff Derek Mitchell was hired as an Auditor I in 2003. He was promoted to Auditor II in October 2005. From 2006 to September 1, 2009, Charles Brown was Plaintiff's direct supervisor. After Brown, Timothy Yung became Plaintiff's direct supervisor. The parties identify Brown as an African American and Yung as an Asian American.

As Plaintiff's direct supervisor, Brown completed Plaintiff's performance evaluations for 2006. Brown's evaluations were reviewed by Rommel Pitchan, an Audit Manager for the Department of Revenue. Plaintiff received a rating of "Good" (2.8/4.0) for the first six months of the year. Brown noted that Plaintiff's overall performance was good, but that Plaintiff needed to work on adhering to Department of Revenue policies. Brown recommended and Plaintiff received a merit pay increase on October 1, 2006. For the second half of 2006, Plaintiff did not complete any audits, issued only 3 assessments, had low metric scores, and was barely in the field on his local audits. As a result, Brown gave Plaintiff an overall rating of "Requires Improvement" (2.4/4.0).

Plaintiff had a pair of notable disciplinary incidents in 2006. On September 12 and December 21, 2006, Plaintiff was "absent without approved leave." Apparently Plaintiff believed that he could use sick leave to take his pets to the veterinarian. He was suspended for one day for the unapproved absences. Plaintiff grieved his suspension and prevailed, although the hearing officer observed that Brown should have promptly denied Plaintiff's requests to use sick leave for his pets. Plaintiff eventually received back pay for the day that he was suspended.

In 2007, like 2006, Brown completed, and Pitchan reviewed, Plaintiff's performance evaluations. During the first half of the year, Plaintiff completed 7 of 10 targeted assessments and had the lowest in-field percentage on local audits in the unit. He received an overall rating of "Requires Improvement" (2.6/4.0). Plaintiff was denied a merit pay increase on October 1, 2007. That denial was reviewed and upheld. In the second half of 2007, Plaintiff completed 5 of 9 targeted assessments and, as he did for the first half of the year, received a rating of "Requires Improvement" (2.6/4.0).

Plaintiff was suspended three times during the second half of 2007.  First, on August 16, Plaintiff came to work dressed in a white t-shirt with printing on the front.  He was instructed to go home and change into work-appropriate clothes.  Plaintiff left work but did not return.  Plaintiff was suspended for a day for his dress code violation and failure to return to work.  Plaintiff grieved the suspension, but the grievance was denied.  Second, on August 21, 2007, a little less than a week after the dress-code violation, Plaintiff had a meeting with Brown about the dress code and his failure to return to work.  Plaintiff acted in a way that Brown considered insubordinate, verbally threatening, and intimidating.  Brown suspended Plaintiff for three days.  Plaintiff grieved the suspension for "insubordinate conduct unbecoming a public employee."  The hearing officer upheld the three-day suspension.  The hearing officer determined that Plaintiff behaved in a manner that was intended to show disrespect to his superior and that Plaintiff's conduct was unjustified and contrary to City Personnel Rules, regardless of Plaintiff's feelings about what was discussed at the meeting.  Third, on October 19, 2007, Brown issued Plaintiff a five-day suspension for poor work performance.  Plaintiff grieved the suspension.  Prior to the grievance hearing, the Labor Relations Supervisor and Plaintiff's Union representative agreed to reduce the suspension from five to three days.

In 2008, Brown gave Plaintiff a performance rating of "Good" (2.9/4.0) for the first half the year and a rating of "Good" (3.0/4.0) for the second half of the year.  Brown noted that Plaintiff completed his targeted number of assessments and improved his time-metrics score.  The second half of 2008 was similar: Plaintiff completed his targeted assessments and maintained his time-metrics score.  Plaintiff was denied merit pay increases on March 1 and May 1, 2008.  Plaintiff grieved both denials, and the denials were upheld by the hearing officer.  On October 1, 2008, in light of Plaintiff's good performance in 2008, Brown recommended and

Plaintiff received a merit pay increase. Plaintiff describes 2008 as a period during which he "was able to perform his job without harassment from management." [151 at 12].

According to Brown's performance evaluation, Plaintiff's performance declined in the first half of 2009, and he received an overall performance rating of "Requires Improvement" (2.7/4.0). Plaintiff did not meet his productivity goals, even as adjusted for time on administrative leave and a 15-day suspension. Brown concluded that Plaintiff had violated office polices and was therefore deficient in the teamwork and leadership category. Plaintiff was denied a merit pay increase on October 1, 2009.

Plaintiff 15-day suspension was for acting unprofessionally during two meetings with department managers. According to the "Notice of Progressive Discipline for Criminal or Improper Conduct," Plaintiff became "irate during meeting [sic] with department managers. His tone was loud and aggressive. He was excited and disruptive. His outbursts were accusatory and demeaning towards management staff." Violence in the Workplace Incident Reports were filed, and Plaintiff was placed on non-disciplinary administrative leave — leave with pay — during the investigation. The investigator did not sustain the violence in the workplace claims. Plaintiff then grieved his suspension and it was reduced to 10 days.

Plaintiff's employment situation appears to have improved during the second half of 2009. He received a rating of "Good" (3.0/4.0) in a performance evaluation by Yung, reviewed by Pitchan. Yung noted that Plaintiff completed 12 assessments, surpassing his goal of 11. Yung also observed that 11 of his 12 assessments were completed within the targeted number of hours. The one file that Plaintiff did not complete within the required hours involved a "difficult taxpayer." Plaintiff completed one file 11% faster than the targeted hours. Yung's report indicated that Yung and Plaintiff had some difficulties at the beginning of the period ("in the

beginning, I think you took the point clearances personally"), but that their relationship improved as the year wore on ("you got comfortable with my style and became comfortable with yours"). [128 at 526-27]. Yung recommended and Plaintiff received a merit pay increase on January 1, 2010.

Plaintiff filed three administrative charges of discrimination with the Illinois Department of Human Resources and the EEOC, all in 2007. In his first charge, Plaintiff claimed that he was harassed between August 14 and August 29, 2007. He also claimed that his suspension for violating the dress code and failing to return to work was discriminatory. In his second administrative claim, Plaintiff alleged racial harassment between September 13 and September 20, 2007, for being called into the office for violating work policies. Plaintiff also alleged retaliatory harassment between September 18 and September 20, 2007 for having filed his first administrative charge. He further claimed that his three-day suspension for alleged insubordinate conduct and threatening and intimidating an audit manager during a meeting was due to his race and in retaliation for his first administrative charge. In his third claim, Plaintiff alleged that his five-day suspension on October 19, 2007, for poor work performance, was because of his race and in retaliation for his previous administrative charges of discrimination, and that he did not receive a merit pay increase on October 19, 2007 because of his race and in retaliation for his previous administrative charges of discrimination.

On May 1, 2009, Plaintiff submitted a complaint to his employer alleging that his supervisor, Brown, was engaged in a romantic relationship with a female employee and that he was in violation of the Personnel Rules for not reporting the relationship. Plaintiff previously had been in a romantic relationship with that same woman. Plaintiff's internal complaint speculated that Brown "had been lashing out at me for some reason or another over the past two

years" and that Brown's discovery of Plaintiff's past relationship with that woman "could be the reason for the harassment and unfair treatment sustained by [Brown] over the last few years." The Department of Revenue Personnel Division investigated Plaintiff's allegations and concluded that there was no evidence that Brown was involved in an inappropriate romantic relationship.

Plaintiff filed his lawsuit *pro se* in June 2009. Approximately one month later, Plaintiff retained counsel and Plaintiff was granted leave to amend his complaint. Defendant moved to dismiss the amended complaint. In May 2010, the Court denied Defendant's motion. The parties concluded discovery in April 2012. Plaintiff then moved to reassign *Garcia v. City of Chicago*, 10-cv-3277 (a national origin and age discrimination lawsuit by a former Auditor II against Defendant) to this Court for consolidation. The Court denied Plaintiff's motion. Defendant has now moved for summary judgment.

## II.    Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

No heightened standard of summary judgment exists in employment discrimination cases, nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility frequently are critical issues in employment cases that in many instances are genuinely contestable and not appropriate for a court to decide on summary judgment. See *id.* Nevertheless, summary judgment in favor of the defendant is hardly unknown or, for that matter, rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

## III.    Analysis

Plaintiff alleges that Defendant discriminated against him based on his race, retaliated against him for complaining about that discrimination, and subjected him to a hostile work environment in violation of Title VII, 42 U.S.C § 1981, and 42 U.S.C. § 1983. Because Plaintiff is required to prove the same *prima facie* elements under Title VII, § 1981, and §1983 the Court will address those claims together. *See, e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 n. 1 (1993); *Hobbs v. City of Chicago*, 573 F.3d 454, 459 n. 1 (7th Cir. 2009); *Bennett v.*

*Roberts*, 295 F.3d 687, 697-98 (7th Cir. 2002); *Bates v. City of Chicago*, 2012 WL 280664, at *10 (N.D. Ill. Jan. 31, 2012).

### A.    Race Discrimination

Plaintiff alleges employment discrimination on the basis of race in violation federal law. Plaintiff may prove discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671-72 (7th Cir. 2008) (explaining the misleading nature of this nomenclature and reiterating that the direct method may be proven with either direct or circumstantial evidence and that the indirect method proceeds under the burden-shifting rubric set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973)); see also *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Under the direct method of proof, the plaintiff may introduce either direct or circumstantial evidence to create a triable issue as to whether the adverse employment action was motivated by a discriminatory intent. *Id.*; see also *Isbell v. Allstate Ins. Co.,* 418 F.3d 788, 794 (7th Cir. 2005); *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997). In other words, the plaintiff must show either "an acknowledgement of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004) (citing *Gorence v. Eagle Foods Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001)).

Under the indirect method of proof initially set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff first must establish a *prima facie* case of discrimination. 411 U.S. at 802-04. In order to establish a *prima facie* case of race, sex, and/or age discrimination, a plaintiff must establish that: (1) he was a member of a protected class; (2) he was qualified for the job or was

otherwise meeting the defendant's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside the protected class more favorably. See *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007). If the plaintiff successfully establishes a *prima facie* case, a rebuttable inference of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. See *Essex v. United Parcel Serv. Inc.*, 111 F.3d 1304, 1308 (7th Cir. 1997); see also *Fane,* 480 F.3d at 538. Once the defendant provides a legitimate explanation, the burden then shifts back to the plaintiff to prove that the proffered justification is pretext. *Fane*, 480 F.3d at 538.

In this case, Plaintiff concedes that he cannot prove his case under the direct method and proceeds by the indirect method exclusively. As summarized above, under the indirect method, a *prima facie* case of employment discrimination on the basis of race has four elements. The first element is uncontested; Plaintiff is a member of a protected class. On the second element, Defendant mentions in a footnote of its brief in support of summary judgment that Plaintiff was not meeting his employer's legitimate expectations. As to the third element, the parties disagree about exactly what counts as an adverse employment action. They agree that suspensions count but disagree about whether denials of merit pay should. Because Defendant has not developed its argument on the second element and because assuming that Plaintiff has established the second and third elements will not affect the outcome of the case or motion currently before the Court, the Court will assume for present purposes that Plaintiff has carried his burden on those elements.

Plaintiff has not, however, established the fourth element — that Defendant treated similarly situated employees outside the protected class more favorably. "A similarly situated

employee is one who is directly comparable to [the plaintiff] in all material respects." *Teninty v. Geren*, 776 F. Supp. 2d 725, 737 (N.D. Ill. 2011). To evaluate whether two employees are directly comparable, a court considers all relevant factors, including whether the employees (1) held the same job description, (2) were subject to the same standards, (3) were subordinate to the same supervisor, and (4) had comparable experience, education, and other qualifications. *Rummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 688, 692 (7th Cir. 2005). Thus, the Court looks only at those employees who are similarly situated to Plaintiff in evaluating Plaintiff's claims. During discovery, Magistrate Judge Keys limited Plaintiff's potential comparators to Auditor IIs for matters of performance and merit pay increases and to Auditors I-IV for matters of discipline. Discovery on potential comparators was limited accordingly. Plaintiff has not challenged Judge Keys' ruling.

In opposing Defendant's motion for summary judgment, Plaintiff identifies three Department of Revenue employees outside his protected class who he claims received more favorable treatment. [150 at 7]. Employee 1, an Auditor IV, allegedly was (a) suspended for failure to complete an assignment in 2006 but still received a merit pay increase in 2007 and (b) yelled at a supervisor but was not disciplined for doing so. Because Employee 1 was an Auditor IV, her performance evaluations were not produced, and so there is no record evidence of her performance, and the Court is not in a position to determine whether or why she received a merit pay increase. Perhaps more importantly, the Court agrees with Judge Keys that, at least regarding matters of performance, Plaintiff is not similarly situated to Auditor IVs who may have supervisory responsibilities over other Auditors. Plaintiff also claims that Employee 1 yelled at a supervisor but was not disciplined for the outburst. But the deposition testimony that Plaintiff cites does not support the proposition that Employee 1 was not disciplined. The deponents say

only that they do not know if she was disciplined, or (at most) did not think she was. See, *e.g.*, Pl. Ex. J ("I saw [Employee 1] screaming at her supervisor * * * but I don't know if she got in trouble for it or not"); Pl. Ex. M (Q: "Do you know if she was ever disciplined for that?" A: "I do not know. She was crying.").

Employee 2 was an Auditor II who failed to meet his target assessments in 2007, but, according to Plaintiff, nonetheless "initially" received a merit pay increase in March 2008. Plaintiff's assertion that Employee 2 "initially" received a merit pay increase is misleading. According to Employee 2's testimony, he was initially told he would receive an increase, but he was then told that the increase was not approved and he would not be receiving an increase. According to his own testimony, he did not initially receive *an increase*. Rather, he was told by someone without the power to grant a merit pay increase that he would get one, and that turned out to be wrong. Thus, like Plaintiff, Employee 2 was denied a merit pay increase when his performance was poor. Finally, Employee 3 wore gym shoes to work but was not disciplined. Employee 3 was an administrative assistant. As an administrative assistant, she was not similarly situated to Plaintiff. Not having identified similarly situated employees outside his protected class who received more favorable treatment, Plaintiff has failed to state *prima facie* case of discrimination using the indirect method.

Even if Plaintiff could state a *prima facie* case, his claim would still fail, for he has not shown that the reasons Defendant offered to justify his treatment were a pretext, covering some other, perhaps illicit, motive. In order to establish pretext, a plaintiff must show that the defendant's articulated reasons for its adverse employment actions: (1) had no basis in fact, (2) did not actually motivate the actions, or (3) were insufficient to motivate the actions. *Jackson v. Am. Airlines, Inc.*, 2008 WL 4211121, at *7 (N.D. Ill. Sept. 10, 2008). Plaintiffs must

"specifically refute facts which allegedly support the employer's proffered reasons; conclusory statements about an employer's prejudice are insufficient to establish pretext." *Id.* at *8 (internal quotations and citations omitted).

Plaintiff first points to "comparator evidence" in his attempt to show that Defendant did not discipline Plaintiff for poor performance, inappropriate conduct at meetings, and failing to return to work as required. As just discussed, however, Plaintiff has not shown that similarly situated employees outside his protected class were treated differently. In his discussion of pretext, Plaintiff does not expand on his comparator arguments. See [150 at 9]. Plaintiff also refers generally to testimony of Department of Revenue employees and union representatives who believe that "African-Americans were treated differently, subjected to different standards, disciplined more often and more harshly than other races." That, however, is a conclusion, not a challenge to any of the (many) reasons Defendant has offered for its disciplinary actions against Plaintiff. The one argument for pretext that Plaintiff develops concerns Brown's alleged retaliation against Plaintiff for reporting a romantic relationship between Brown and a female employee. The implication is that Brown evaluated Plaintiff as he did because of romantic jealousy. Plaintiff, however, does not allege that this conflict with Brown had anything to do with race, and that the reasons Brown offered for his 2009 evaluation were "intended to provide cover for illegal [race] discrimination." *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946-47 (7th Cir. 2006); see also *EEOC v. Concentra*, 496 F.3d 773, 777 (7th Cir. 2007) (district court's dismissal of Title VII claim alleging favoritism for a lover, not race discrimination, was "probably correct").

### B.    Retaliation

Under the anti-retaliation provision of Title VII, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Brown*, 499 F.3d at 684 (quoting 42 U.S.C. § 2000e-3(a)).  "A plaintiff may prove retaliation by using either the direct method or the indirect, burden-shifting method." *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662 (7th Cir. 2006) (quotations and citations omitted).

"Under the direct method, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) there was a causal connection between the two." *Id.* at 663 (quotations and citations omitted).  Alternatively, under the indirect approach, in order to establish a *prima facie* case for retaliation, the employee must show that (1) after filing a charge, the employee was subject to adverse employment action; (2) at the time, the employee was performing his job satisfactorily; and (3) no similarly situated employees who did not file a charge were subjected to an adverse employment action.  See *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir. 2004).  "'If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action.'"  *Tomanovich,* 457 F.3d at 663 (quoting *Adusumilli v. City of Chicago,* 164 F.3d 353, 362 (7th Cir. 1998)).  Then, if the employer presents evidence of a non-discriminatory reason for its employment action, "'the burden shifts back to the plaintiff to demonstrate that the employer's reason is pre-textual.'"  *Id.* (quoting *Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir. 2005)).

In the introduction to his retaliation argument, Plaintiff states that he will use both the direct and indirect methods to support his retaliation claim. Despite that announcement, Plaintiff's argument is focused on "suspicious timing," what Department of Revenue employees knew and when, and does not mention similarly situated employees. In other words, Plaintiff opted to use the direct method only.

To support his conclusion that there was a causal connection between his EEOC charges and adverse employment actions, Plaintiff focuses on timing. An adverse employment action that follows closely on the heels of a discrimination complaint may support a causal connection between the two, but "suspicious timing alone rarely is sufficient to create a triable issue" *Id.* at 664 (quoting *Moser*, 406 F.3d at 905). "Moreover, while '[t]here is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method, * * * it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Id.* (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)).

In its entirety, stripped of quotations from cases and generic statements of retaliation law, Plaintiff's argument for retaliation based on temporal proximity is this:

> Mitchell filed his initial EEOC charge of discrimination on September 11, 2007. (Def. Facts ¶51). He suffered adverse action (Def. Facts ¶¶44-50). Immediately after filing the charge, Mitchell was subjected to several instances of retaliatory treatment including but not limited to, suspensions for alleged insubordinate conduct, dress code violations, poor work performance and excessive tardiness. (Pl. Facts ¶31 see Pl. Interrgo. ¶4(12-24)).

[150 at 12]. The "adverse action[s]" referred to in Defendant's Rule 56.1 statement are suspensions. To support his claim of "retaliatory treatment," Plaintiff cited to a statement that a manager was out of dress code while at a meeting about Plaintiff being out of dress code. According to the deposition testimony supporting that statement, a manager at the meeting wore a crew-neck t-shirt. The last citation in Plaintiff's argument is to Plaintiff's answers to

interrogatories. In his answers, he lists what he considered discriminatory conduct by management.

Plaintiff's argument is notable for what it is missing. It does not provide details about the temporal proximity of Plaintiff's complaints to any alleged adverse actions. It does not engage any of Defendant's arguments about why that timing is not suspicious. The Court reminds Plaintiff that it is not the Court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in his client's favor * * *." *Dal Pozzo v. Basic Machinery Co., Inc*., 463 F.3d 609, 613 (7th Cir. 2006). Plaintiff has not done that.

Even though Plaintiff did not bother to mention the relevant details in its response to Defendant's motion [150], the Court nonetheless recognizes that 2007 was a fraught year for Plaintiff. 2006 ended with disputes about absences for pet care. 2007 started with a suspension for those absences. Plaintiff then failed to complete several of his targeted assessments and received a rating of "Requires Improvement" in his mid-2007 performance evaluation. On August 16, 2007, Plaintiff was sent home to change his clothes but did not come back to work. Less than a week later, Plaintiff had an outburst at a meeting about the dress code and his failure to return to work. Brown considered Plaintiff's behavior at the meeting threatening and insubordinate. Soon after, on September 10, 2007, Plaintiff was issued a suspension for his dress code violation and failure to return to work. On September 11, 2007, Plaintiff filed his first charge with the EEOC. On September 20, 2007, Plaintiff was issued a suspension for misconduct at the meeting about his dress code problem. Plaintiff filed another charge with the EEOC five days later. On October 19, 2007, Plaintiff was issued a suspension for poor work performance. Within a week, Plaintiff filed his third and final Charge with the EEOC.

Plaintiff's performance evaluation for the second half of 2007 stated that Plaintiff's performance "Requires Improvement." The parties agree that 2008 was much better. Brown gave Plaintiff two "Good" performance evaluations, Brown recommended and Plaintiff received a merit pay increase, and Plaintiff himself describes 2008 as a period during which he "was able to perform his job without harassment from management." The good times did not last, unfortunately, and 2009 brought more disagreements, another suspension, and this lawsuit.

Even assuming that the individual or individuals responsible for issuing the September and October 2007 suspensions knew that Plaintiff had filed complaints with the EEOC (the other issue discussed in Plaintiff's retaliation argument, see [150 at 13-14]), that plus the timing of Plaintiff's suspensions does not create a triable issue. Plaintiff was suspended twice before his EEOC charges, and again long after he made his EEOC charges, and there was a year without suspensions or discipline in between. In short, the undisputed evidence is Plaintiff had good and bad times at work before and after he made his EEOC charges. Plaintiff made his EEOC claims during a period where things were not going well at work and Plaintiff was in the process of being disciplined for conduct that predated his charges. Filing a charge with the EEOC did not immunize Plaintiff from discipline or place a hold on disciplinary processes already underway. Retaliation for complaints about alleged race discrimination is prohibited, but evidence that ongoing disciplinary processes for documented misconduct were not frozen does not establish retaliation. Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

### C. Hostile Work Environment

In order to establish a *prima facie* case of hostile work environment, a plaintiff must demonstrate that (1) he was subject to unwelcome harassment; (2) the harassment was based on

his race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Luckie v. Ameritech Corp.,* 389 F.3d 708, 713 (7th Cir.2004); see also *Dear v. Shinseki,* 578 F.3d 605, 611 (7th Cir. 2009). To satisfy his burden, a plaintiff must present evidence showing "a workplace permeated with discriminatory ridicule, intimidation, and insult." *Id.* at 714. Normally, such allegations of harassment are supported by facts that the plaintiff is the target of racial slurs, epithets, or other overtly race-related behavior. *Id.* at 713. Defendant maintains that Plaintiff's hostile work environment claim fails for three reasons: first, Plaintiff was not harassed at all; second, even if he was subjected to harassment, it was not objectively offensive or so severe or pervasive that it altered the conditions of his employment; and, third, there is no evidence that any of the alleged harassment was motivated by Plaintiff's race.

In his amended complaint, Plaintiff alleges that he was harassed by the city management because he was made to sign in and out for breaks, the sign-in sheet was placed on a manager's desk, and a manager "smirked" at him while denying a request for a vacation day. In opposing Defendant's motion for summary judgment Plaintiff declares that "Mitchell identified 24 instances of harassment by the Defendant." [150 at 10]. Unfortunately, Plaintiff's response brief does not describe any of those events. The citation attached to Plaintiff's conclusory statement about "24 instances of harassment" points to paragraph 32 of Plaintiff's Rule 56.1 statement, but that paragraph also fails to provide any details about the alleged harassment. Paragraph 32 does refer the Court to an exhibit containing Plaintiff's answers to interrogatories, but, as the Seventh Circuit has stressed, facts are to be set forth in Rule 56.1 statements, and it is not the role of the Court to parse the parties' exhibits to construct the facts. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991). "Nor are

they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue*, 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing DiLeonardi, 181 F.3d 865, 867 (7th Cir. 1999)).

Plaintiff's other supporting argument is that he "found the environment so abusive that he sought the assistance of the [Employee Assistance Program]." [150 at 10]. Although that may support the proposition that Plaintiff *believed* his work environment was offensive or hostile, to survive summary judgment Plaintiff must come forward with evidence that his work environment was *objectively* offensive, "one that a reasonable person would find hostile or abusive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). Plaintiff's summary judgment materials do not come close to meeting that requirement. Based on those materials, no reasonable factfinder could conclude that there was harassment at Plaintiff's workplace that was so severe or pervasive that it altered a condition of his employment in any significant way. *Id.;* see also *Smith v. Northeastern Ill. Univ.,* 388 F.3d 559, 566 (7th Cir. 2004) (work environment was not objectively hostile within the meaning of Title VII, even when racial and derogatory slurs had been overheard by African-American employees on a number of occasions). As the Seventh Circuit has explained, "Title VII 'does not guarantee a utopian workplace, or even a pleasant one.'" *Patton v. Indianapolis Public Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (quoting *Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1162 (7th Cir. 1994)); see also *Spearman v. Ford Motor Co.,* 231 F.3d 1080, 1086 (7th Cir. 2000) (Title VII is not a "general civility code" for the workplace) (internal citations omitted). Moreover, Plaintiff's summary judgment materials have not connected the alleged workplace harassment to race. See, *e.g.*, *Luckie*, 389 F.3d at 713 (summary judgment appropriate because alleged incidents were insufficiently connected to race); *Beamon v. Marshal & Isley Trust Co.* 411 F.3d 854, 863-64 (7th Cir. 2005); *Williams v. Waste Management*, 361 F.3d 1021, 1033 (7th Cir. 2004).

### D. Monell

A municipality can be liable under § 1983 when its policies or customs cause a plaintiff's constitutional injury. See *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 694 (1978). Specifically, to prevail on a § 1983 claim against a city a plaintiff must prove: (1) a violation of his constitutional rights; (2) an injury; and (3) that the injury and violation of rights was directly caused by the City's own action or inaction that carried the requisite degree of fault. *Board of County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 403–05 (1997). As the Court explained in addressing Defendant's motion to dismiss, § 1983, by itself, does not create substantive rights. Rather, § 1983 serves as a vehicle for vindicating rights that are furnished elsewhere. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 816 (1985). One such source is § 1981, which says that people who are not white have the same right to "make and enforce contracts" as white people. 42 U.S.C. § 1981(a). When a plaintiff invokes § 1981 in pursuit of state actors, his claims must use the § 1983 vehicle, which means that the standards in *Monell* and its progeny apply to § 1981 municipal liability. *Jett v. Dallas Independent Sch. Dist.,* 491 U.S. 701, 731–34 (1989) (holding as a matter of statutory interpretation that § 1983 is the exclusive remedy in damages suits against state employees for § 1981 violations and that *Monell* applies); *Smith v. Chicago Sch. Reform Bd. of Trs.,* 165 F.3d 1142, 1148 (7th Cir. 1999).

Plaintiff argues that the Department of Revenue's "dress code policy * * * was repeatedly used to harass and intimidate [Plaintiff] in violation of his constitutional rights." [150 at 18]. The Court addressed Plaintiff's challenge to the dress code in the previous sections. Plaintiff's claim is not that the dress code itself violates the constitution (Plaintiff is not challenging the dress code on First Amendment grounds, for example), but that the dress code has been used to harass him on the basis of race. Plaintiff, however, failed to come forward with evidence of

selective enforcement, and so has failed to create a triable issue about the dress code. In short, Defendant cannot be liable under *Monell* for the simple reason that Plaintiff has not presented evidence from which a reasonable jury could conclude that he suffered a constitutional injury. See, e.g., *Houskins v. Shehan,* 549 F.3d 480, 493 (7th Cir. 2008) (where plaintiff fails to establish deprivation of a constitutional right, *Monell* claims must also fail); *Tesch v. County of Green Lake,* 157 F.3d 465, 477 (7th Cir. 1998) (a *Monell* claim "requires a finding that the individual officers are liable on the underlying substantive claim."); *Alexander v. City of South Bend,* 433 F.3d 550, 557 (7th Cir. 2006) (finding that a municipality defendant cannot be liable under *Monell* for a policy or custom of inadequately training or supervising its police officers, unless the defendant violated a constitutional guarantee); *Aguilera v. Baca,* 510 F.3d 1161, 1167, 1174 (9th Cir. 2007) (noting that if no constitutional violation occurred, the court need not consider qualified immunity or a claim brought pursuant to *Monell* ); *Wilson v. Morgan,* 477 F.3d 326, 340 (6th Cir. 2007) (noting that if a jury found no constitutional violation by individual defendants, a county could not have been found liable under *Monell* for an allegedly unconstitutional custom or policy); *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct"); see also *Durkin v. City of Chicago,* 341 F.3d 606, 615 (7th Cir. 2003) ("a municipality cannot be found liable if there is no finding that the individual officer is liable on the underlying substantive claim"); *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986).

## IV.    Conclusion

For the reasons stated above, Defendant's motion for summary judgment [114] is granted.  A Rule 58 judgment in favor of Defendant and against Plaintiff will be entered in a separate document.

Dated: March 7, 2013
                                     _____
                                          Robert M. Dow, Jr.
                                          United States District Judge